REYNOLDS *vs.* TOOKER & HAIT.

REYNOLDS & REYNOLDS *vs.* THE SAME.

THE PRESIDENT, DIRECTORS AND COMPANY OF THE DUTCHESS COUNTY BANK *vs.* THE SAME.

Where a judgment creditor has two funds to which he may resort for satisfaction of his debt, and a junior judgment creditor is able to reach only one of the funds, the first creditor will be required primarily to resort to that fund for satisfaction of his debt over which he has *exclusive* control.

This rule of law, however, will not be enforced against the *assignees* of the first creditor, who had become purchasers of the exclusive fund and paid the full value thereof *previous* to the second creditor obtaining any lien either legal or equitable.

### Reynolds v. Tooker.

Mᴏᴛɪᴏɴ as to the application of moneys raised on executions as between conflicting plaintiffs. In August, 1835, *Tooker & Hait*, the judgment debtors, entered into a contract to build a ship for *The Dutchess Whaling Company*, at a price per ton which amounted in the aggregate to about $13,000 ; the company to make certain specified payments as the work progressed, the last payment to be made when the vessel should be delivered afloat. She was to be launched on or before the 1st April, 1836, but was not until June. On the 7th June the ship was delivered to and received by the company, in pursuance of the contract. The company had made payments, from time to time, to Tooker & Hait, commencing in November last, and on the 18th June had paid in all over $12,400, which was more than the value of the work at the contract price.

In *November* last the *Dutchess County Bank* recovered a judgment in this court against *Tooker & Hait* for $9000, and upwards, on which a *fieri facias* was issued to the sheriff of Dutchess, who on the 25th *May*, levied the [592] execution *on the ship*, and on *other articles of personal property* belonging to the debtors. On the 28th *June* last the plaintiffs in the two first above entitled suits severally recovered judgments against Tooker & Hait in this court—the first for $711.76, and the other for $763.07. *Fi. fas.* were issued the same day on both of these judgments, and delivered to the same officer. The sheriff advertised the ship and other personal property to be sold, by virtue of the *three executions*, on the 14th July. The plaintiffs in the two junior judgments appeared and insisted that the sheriff should first sell the *ship* to satisfy the execution of the bank, which was a lien upon it—leaving the other personal property (if the ship sold for enough to pay the bank) to apply on their judgments. This was objected to ; and the sheriff adjourned the sale to the 25th July. On that day the bank assigned its judgment to the whaling company, and the assignees gave notice to the sheriff that the ship was discharged from the lien of the execution, and directed him to abandon the levy. The sheriff still offered to sell the ship on the bank judgment if the two junior judgment creditors would indemnify him ; but that was declined. The sheriff then sold the other personal property of the debtors, which brought $692.93. The amount due on the bank judgment at the time of the sale was upwards of $5000. The judgment debtors were insolvent. The whaling company, in consequence of the lien of the bank execution and of their being obliged to purchase the judgment, will lose more than $3000 by Tooker & Hait. The Reynoldses will lose the whole of their judgments if they cannot reach the money in the hands of the sheriff.

Notice was given to the sheriff not to pay over the money on the bank judgment, and a motion is now made for an order requiring him to pay it over on the two first above-mentioned judgments.

*By the Court*, Bʀᴏɴsᴏɴ, J. The whaling company purchased the bank judgment to protect their title to the ship. For all the purposes of this motion they stand in the place of the bank—having neither gained nor lost any- [593] thing, as against the junior judgment creditors, by taking the assignment. It was said that the company, as assignees of the bank, were bound to pursue the lien on the ship. They were bound to do so, if that course was obligatory upon the bank before the transfer, and not otherwise. If the bank could discharge the levy on the ship and still pursue the other property, the assignees could do the same. The question then is, what were the rights of the judgment creditors as between themselves, and also in reference to the interests of third persons ?

As between the judgment creditors, and without regard to the rights of third persons, the bank should have resorted in the first instance to the ship for the satisfaction of its judgment. The ship and the other personal property of the debtors, Tooker & Hait, may perhaps be regarded as two funds, upon both of which the bank execution had been levied ; while the junior judgment creditors could only reach one of those funds—the ship having passed beyond the influence of their executions. It is a just and equitable principle, that where there

are two creditors of one debtor, the first having two funds to which he may resort for the satisfaction of his debt, and the second only being able to reach one of the funds, the first shall resort to that source for obtaining payment which is exclusively within his control, and thus leave to the junior creditor the only means he has for obtaining satisfaction of his demand. This course works no injury to either creditor, but does justice to both. (*Evertson* v. *Booth*, 19 *Johns. R.* 492. *Hayes* v. *Ward*, 4 *Johns. Ch.* 132. 1 *Hopk.* 469.) It is upon the same principle of doing equal justice to all as far as may be practicable, that a creditor having a lien upon real estate, part of which has been alienated, may be required to sell in the first instance that portion of it which still remains in the hands of the debtor; and where there have been several sales by the debtor at different periods, the creditor will be required to sell in the inverse order of the alienations. (*Clowes* v. *Dickenson*, 5 *Johns. Ch.* 235. 9 *Cowen*, 403, *S. C. James* v. *Hubbard*, 1 *Paige*, 228.) Although these rules are derived from courts [594] of equity, I think they may be enforced by this court by way of controlling the proper execution of its process.

The creditors in the two junior judgments insist that the principle which has been mentioned establishes their right to the money in the hands of the sheriff; that the bank, (or its assignees,) having relinquished the fund over which it had exclusive control, and which was sufficient for the satisfaction of the debt, had no right to resort to the other property, and thus deprive the junior judgment creditors of the only fund which they could reach. This argument would be unanswerable if it did not overlook the important consideration that the whaling company had purchased the ship and paid the full price for it before the junior judgments were recovered. The ship was delivered and the title passed to the company on the 7th of June, and the payments to Tooker & Hait were completed on the *eighteenth* day of that month. The judgments of the applicants were not obtained until the *twenty-eighth;* and until that time they had no lien, either legal or equitable, upon the property of their debtors. It must not be forgotten that it is a rule of equity on which the applicants rely. It is never applied where it will work injustice. Indeed, the party who seeks to enforce it must show affirmatively that it would be equitable in relation to all parties to afford him that kind of relief. (*Dorr* v. *Shaw*, 4 *Johns. Ch.* 17. *Ex parte Kendall*, 17 *Vesey*, 20.) What then were the equitable rights of the whaling company at the time the applicants recovered their judgments? They had purchased and paid for the ship, and were entitled to hold it as against all the world—subject only to the lien of the bank execution. They did not agree to pay off that charge, but took the property subject to it, for the reason that they had no other alternative. What then were the equities as between the bank and the whaling company, the only persons who at that period had any valid claims upon the property of Tooker & Hait? It was most evidently just that the bank should resort in the first instance to the other property of the debtors, and not touch the ship until they had exhausted all the other means within their reach for obtain-[595] ing satisfaction of the judgment. This course was required by the rule of equity, which has already been considered. It was the only practicable mode of doing equal justice to both parties. The right of the whaling company as purchasers, to insist that the bank should first resort to the other property before touching the ship, had attached before the junior judgments were recovered; and that right could not be divested by any subsequent act of the debtors, as by making a further sale of their property, or confessing judgments to other creditors. The equity set up by the applicants consequently did not arise; and it cannot be allowed to prevail without overturning the prior, and therefore better, equity of the whaling company. It is no doubt just that the junior judgment creditors should be paid; but they cannot reach the money in the hands of the sheriff without interfering with the rights of the creditor, who had gained a valid preference over them.

It was the duty of the bank, while it held the judgment, to sell the other property before resorting to the ship. By purchasing the judgment, the whaling company did not destroy their equity, but acquired the legal means of enforcing it. The proper course has been pursued by the sheriff, and he must be left, as in other cases, to apply the money derived from the sale of the personal property to the oldest execution in his hands.

As this was a fair question in relation to the rights of different parties and the duty of the sheriff under the process of the court, and has been properly presented for consideration, no costs are ordered.        Motion denied.