86  197
179  485

## MARY H. HAWHE *et al.*

*v.*

## GODFREY SNYDAKER *et al.*

1. USURY — *forfeiture of all interest, when enforced.* The forfeiture of all interest under the statute is applicable only to a case where a contract to receive more than ten per cent is shown by the pleadings to have been made, and the forfeiture is of the whole interest so contracted to be received.

2. SAME — *payment in excess of ten per cent applied on principal.* The fact that the maker of a note which draws ten per cent interest may have paid, and

the payee may have received, more than ten per cent will not subject the payee, upon a bill to foreclose a mortgage given to secure such note, to a forfeiture of all interest on the note, when it does not appear that such excess of interest was reserved in the original contract, but where it appears, in such case, that more than ten per cent has been paid on account of interest the court will apply the excess as a payment upon the principal.

3. PRACTICE — *taking default against a party who has answered.* Taking a default against a defendant in a chancery suit after he has filed his answer is an irregularity which does no harm if the final hearing appears to have been upon the bill and the answers of defendants, including the answer of the one defaulted.

4. MORTGAGOR —*rights of parties' claim under conveyance from.* The rights of parties claiming, under separate conveyances from the mortgagor, different parts of the mortgaged premises, are several and not joint, as to any question arising upon releases of other parts of the mortgaged property executed by the mortgagee.

5. MORTGAGE —*effect of release of parts of land, as against grantee of mortgagor, of other parts.* A release of a part of mortgaged premises will not operate, *ipso facto,* as a release of such other parts, as may have been conveyed to other parties by the mortgagor after the execution of the mortgage, but under certain circumstances such a release may discharge *pro tanto* a certain part of the mortgage debt as against those claiming under such conveyance from the mortgagor.

6. SAME — *right of purchaser from mortgagor to have his part sold last in order is superior as to mortgagor but not as to mortgagee.* The right of a purchaser from a mortgagor of a part of property under mortgage, who has paid for his part of the property, to have all the parts of the property left in the mortgagor at the time of his purchase sold first, before subjecting his property to sale to satisfy the mortgage, is a superior right as against the mortgagor, but it is a subservient right as against the mortgagee, and subject to the superior right of the mortgagee to collect his money in the way that is most to his interest.

7. SAME — *when purchaser from mortgagor entitled to have value of land released credited on mortgage.* When a mortgagee has knowledge that the mortgagor has, since the mortgage, sold part of the property to another and received his pay, he must not release any part of the property remaining, and if he does so the purchaser may insist on a credit on the mortgage of a sum equal to the value of the property released.

8. If, however, the mortgagor can secure a part payment on the mortgage debt by releasing a part of the mortgaged property for the purpose of sale, and by applying as a credit on the mortgage debt the full price of the property sold, such release will not charge the mortgagee, as to any part of the mortgaged property previously sold by the mortgagor, with more than the amount the part released actually sold for, unless there is a want of good faith in the transaction.

9. Where, by the terms of a mortgage, the mortgagor and his assigns have the right, upon the payment of a certain sum per acre or per lot, to have any portion of the mortgaged premises released, each purchaser from the mortgagor purchases subject to that provision, and if he fails to procure a release

from the mortgagee, of the part purchased by him, according to the terms of the mortgage, he can not have any part of the money paid by the purchasers of other portions applied as a discharge of the mortgage debt *pro tanto* as against the part purchased by him.

WRIT OF ERROR to the Circuit Court of Cook County; the Hon. E. S. WILLIAMS, Judge, presiding.

Mr. J. W. WAUGHOP, for the plaintiffs in error.

Messrs. ROSENTHAL & PENCE, for the defendants in error.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

This is a writ of error brought to reverse a decree rendered in the circuit court of Cook county, in favor of Godfrey Snydaker and Moses Snydaker, foreclosing two deeds of trust, in the nature of mortgages, upon certain lots in Hawhe's South Park Subdivision. The first deed was given to John G. Rogers by Arthur J. Hawhe, to secure the payment of a note by Hawhe, dated June 29, 1871, payable to Samuel Walker, for $6,500, at one year, with eight per cent interest. The second deed was made by Hawhe to Moses Snydaker to secure the payment of Hawhe's note of July 10, 1871, to his own order, for $10,000, at ninety days, with interest at ten per cent per annum. Each of these notes was assigned to the complainants below on the day of its date. Said deeds were duly recorded. The first deed embraced what now constitutes blocks 1 and 6, in that subdivision. The second deed embraced blocks 1, 6, 2, 3, 5, and the west half of block 4.

Block 1 contains forty-eight lots; block 6 contains twenty-four lots; blocks 2 and 3 each contains forty-eight lots; block 5 contains twenty-four lots, and the west half of block 4 contains twenty-four lots.

In other words the first deed was a first lien on the seventy-two lots in blocks 1 and 6, and the second deed was a first lien on the 144 lots contained in blocks 2, 3, and 5, and the east half of block 4, and was a lien upon Hawhe's

200          HAWHE *et al. v.* SNYDAKER *et al.*     [Sept. T.

Opinion of the Court.

equity of redemption from the first deed in the seventy-two lots in blocks 1 and 6.

A. J. Hawhe, after the record of these deeds, conveyed divers parts of the property, and the Snydakers caused divers portions of the property to be released from the lien of these deeds.

This writ of error is brought by the representatives of A. J. Hawhe, deceased, and by certain parties who purchased certain of these lots from A. J. Hawhe in his lifetime but subsequent to the recording of these deeds of trust.

The first point made is, that the defense of usury was not allowed in the court below. It is insisted that, by reason of that defense, no interest should have been allowed to complainants.

The 5th section of the statute relating to interest provides, in substance, " that no greater sum than interest at the rate of ten per cent per annum shall be *accepted* or *received* by any person ; " but no penalty is attached by statute to the violation of this section.

Section 6 of the same statute provides that " if any person * * * shall *contract* to receive a greater rate of interest * * * than ten per cent upon any contract, such person * * * shall forfeit the whole of the interest so contracted to be received, and shall be entitled only to recover the principal sum due."

Section 7 provides that " the defense of usury shall not be allowed unless set up by plea, or by notice in writing stating that he intends to defend * * * on the ground that the *contract* is usurious."

The answer in this case alleges " that there has *been paid* to complainants large sums of usurious interest, and that complainants have taken and exacted usurious rates of interest of the said Arthur J. Hawhe, and they are now, by the statute of this State, not entitled to recover of these defendants any interest at all ; and these defendants invoke and set up the statute of usury of the State of Illinois, and

claim the application and benefit thereof in this case, and that all manner of lawful deductions to which they are entitled, and that they may prove, may be allowed as credit on said notes, to protect them from the claims and demands of complainants."

The representatives of Hawhe, deceased, claim, under the the proofs, that complainants should have been held to have forfeited all right to recover interest on these notes. This position can not be sustained. Without referring to the strictness in detail which, under such statutes, the courts have required of the party setting up such defense and claiming the benefit of such forfeitures, it is sufficient to say that this answer does not, in substance, in the most general way lay any foundation whatever for the forfeiture of *all* interest. That forfeiture, by the statute, is applied only to the case where there is a " contract to receive " more than ten per cent, and the forfeiture is of " the whole of the interest *so contracted* to be received."

This answer does not allege that in the making of these notes there was any agreement or contract for more than ten per cent; nor, in fact, does the answer set up, in any form, the making of any contract for more than ten per cent interest by any parties.

Unless there is an allegation in the pleading, or notice in writing, stating in substance, in some form, that there has been a contract made to receive more than ten per cent, the statute provides for no forfeiture. It is true that courts will give force and effect to the 5th section of this statute without a specific plea of usury, where their attention is called to such a defense, in a case where the payment of unlawful interest has been exacted. This is done, in such case, by applying as a credit upon the notes so much of the money so exacted as exceeds the lawful interest.

In this case complaint is not made that the sums actually paid were not properly applied by the court in reducing the amount of the indebtedness. The complaint is that the court refused to declare that complainants had forfeited all

interest upon these notes.    This complaint can not be sustained under the pleadings and proofs in this record.

It is next insisted that this decree should be reversed because the representatives of one Thomas F. Johnson were not made parties.    Johnson is named in the bill as a party defendant, and as a subsequent purchaser of lots 46, 47, and 48 in block 1 ; and in relation to him it was proven at the hearing that he was dead, and it is now insisted that a decree is taken against him as well as other defendants.

An examination of the decree shows that no decree was taken against him.    No order was made for the sale of the lots purchased by Johnson.    Johnson's representatives do not complain, and it is not perceived that the plaintiffs in error occupy any position to question the regularity of this part of the proceeding, especially as no cross-bill was filed asking a decree as to the order of sales.

It is claimed, too, that the decree should be reversed because the default of defendants Stephen Race and Charles Race was entered after they had filed their answer.    This irregularity harmed no one, for the record shows that the cause was finally heard upon the bill and the answers of the defendants, among which are mentioned the answers of Stephen Race and Charles Race.    No decree was taken against these defendants, nor did they join in this writ of error.

Next it is complained " that releases have been given with an entire disregard to the equity of the purchasers of lots from Hawhe after he made the two deeds of trust."

The interests of such of the plaintiffs in error as could by any possibility be affected by an error of the court in this respect are several, not joint.    As to Charles McCarthy, he failed to answer the bill, and can not rely upon this defense, as it was not set up by him in the court below.

It is shown by this record that Arthur J. Hawhe conveyed to Hartroff lots 9 and 10 in block 6, in October, 1872 ; and to Harry A. Anderson lots 11 and 12 in block 6 ; and to Wm. H. Feindt lots 5, 6, and 7 in block 6 (this latter

deed was recorded on January 4, 1872); and to Barney Anderson lot 20 in block 5; and to William Shehan lots 21 and 22 in block 5. These latter deeds were shown to have been made before the making of the releases hereinafter mentioned. The bill shows that, before the filing of the bill, Arthur J. Hawhe conveyed to Martha E. Rice lots 4 and 5 in block 2; and to Charles Wright lots 29, 30, and 31 in block 2, and that Hawhe had made a contract with John H. Perry to convey lots 11, 12, and 13 in block 1. No other of the plaintiffs in error seem to have any interest in relation to this question of releases.

There were 216 lots in all. The decree finds 131 of these had been released, and that eighty-five lots had not been released; and that, of the eighty-five lots not released, twenty-six of them had been conveyed by Hawhe in his life, and the proof shows that two others had been conveyed to Johnson, making twenty-eight; and the decree finds eighteen lots of those which had not been released had been conveyed to certain of plaintiffs in error — that is to say: to Hartroff, two lots; to H. A. Anderson, two lots; to Wm. Feindt, three lots; to Barney Anderson, one lot; to Wm. Shehan, two lots; to Martha E. Rice, two lots; to Charles Wright, three lots; to Charles McCarthy, three lots. The record also shows that a contract had been made by Hawhe with one of the plaintiffs in error, Perry, for the conveyance to him of four lots — making in all twenty-two lots in which some one of the plaintiffs in error claim an interest. These were all embraced in the decree for sale — Perry's lot to be sold under the Rogers deed, and the others under the deed to Moses Snydaker — or the second mortgage, as it is called.

None of the lots thus *conveyed* are required by this decree to be sold under the first mortgage, and none of them were sold under that mortgage. Lots 11, 12, 13 and 14 in block 1 were sold under this first mortgage. As to them the bill alleges that " Hawhe had made an agreement for the conveyance unto one John H. Perry of" these lots, and this

allegation is admitted in the answers; but there is no allegation or proof relating to the terms of this agreement — nothing to show that Perry had performed his part of the agreement, or that he had paid anything on this agreement. In a word, there is nothing to show that Perry is in any way injured by the decree. Before the circuit court could properly be called upon to protect a supposed equity of Perry, it should be shown plainly what *that equity is.*

As to the lots of the other plaintiffs in error, who held conveyances from Hawhe, they were all sold under the second mortgage.

This second mortgage (or deed of trust) contained a stipulation that the mortgagee would release to the mortgagor, or his assigns, " any portion of the premises, upon payment (by the party seeking the release) of $1,000 per acre for any part thereof."

This property, when mortgaged, had not been laid off into blocks and lots, but was subsequently so subdivided. The proof shows that the lots were of uniform size, and of such size that each lot was equivalent to the one-tenth of an acre. The substance of this contract, then, was that the mortgagee would release any given number of lots upon payment at the rate of $100 per lot.

As already stated, the second mortgage was a first lien upon 144 lots (in blocks 2, 3, and 5, and in the east one-half of block 4), and as to the seventy-two lots (in blocks 1 and 6) the second mortgage was a lien on merely the equity of redemption under the first mortgage.

Hartroff, H. A. Anderson, William Feindt, Barney Anderson, Shehan, Martha E. Rice, and Charles Wright, respectively, complain that, after their lots were conveyed by Hawhe to them, the complainants caused or suffered other lots to be released from these mortgages, by which an undue proportion of the burden of the mortgage debt was thrown upon their lots; and they insist in their answers that thereby their lots became, by operation of law, released and freed entirely from the mortgage. Under no

circumstances could a release of a part of the mortgaged premises operate, *ipso facto*, to accomplish such a release. Under certain circumstances such releases of a part may operate to discharge, *pro tanto*, a certain part of the mortgage debt, as against a former purchaser.

Under this second mortgage, however, every purchaser of a lot from Hawhe knew, by the provision in the mortgage, on record at the time he bought, that he had the right, upon paying a given sum of the purchase money to the holder of the mortgage, to have his lots so purchased released from the mortgage. He also knew that every other purchaser who might come after him had a similar right as to the lots he might buy.

Under these circumstances, common prudence would dictate that each of these plaintiffs in error should have, before paying Hawhe the full purchase money, called upon the holder of the mortgage, and have procured a release of his lots, or at least should have given to the holder of the mortgage notice that he had paid in full for his lot, without procuring a release of his lot.

The Snydakers knew generally that Hawhe was making sales to third parties. They knew, also, that parties were from time to time coming to them in person, or through Hawhe, and, upon making payment to the Snydakers, procuring releases of their lots. But there is no evidence tending to show that they knew, at the time of the making of any one of these releases mentioned in the bill, that any persons (other than those whose lots they released) had bought lots of Hawhe and paid him for them. Nor is there anything in the record showing that the releases made after the bill was filed were made without applying on that account *all the credit* which the former purchasers had a right to require should be applied to the mortgage debt on that account. It may be that the evidence tends to show that some of the lots were released without the receipt by the Snydackers of the full amount of $100 to the lot; but the record nowhere discloses which lots were so released, nor is.

the time when such voluntary releases were made disclosed in this record. It may well be, for aught shown in this record, that some of these lots were voluntarily released before any of these plaintiffs in error had any interest in any part of the property. It is insisted that many of the releases are shown to have been made after the respective purchases made by the plaintiffs in error. This is true; but the proof fails to show that the proper credits were not made on the mortgage debt when these later releases were made.

The right of a purchaser from the mortgagor of a part of property under mortgage, who has paid for his part of the property, to have all the parts of the property left in the mortgagor at the time of his purchase sold first, before subjecting his property to sale to satisfy the mortgage, is a superior right as against the mortgagor, but it is a subordinate right as against the mortgagee, and is subject to the superior right of the mortgagee to collect his money in the way that is most to the interest of the mortgagee. The purchaser from the mortgagor can hold the mortgagee to account only where the mortgagee has wantonly, or in unjust indifference to the known equitable rights of such a purchaser, impaired such right by his act, when no reasonable consideration of the interests of the mortgagee required the act to be done which is complained of. Hence, when a mortgagee has knowledge that the mortgagor has, since the mortgage, sold part of the property to another, and received his pay, he must not release from the mortgage, *without adequate consideration,* any part of the property remaining in the hands of the mortgagor, or in the hands of a later purchaser; and should he do so, the first purchaser may insist on a credit on the mortgage, as against him, of a sum equal to the full value of the property released. If, however, the mortgagee can secure a part payment on the mortgage debt, by releasing a part of such remaining part of the property for the purposes of sale, and by applying as a credit on the mortgage the full price of the property

last sold, such release would not charge the mortgagee with more than the amount such property actually sold for, unless the price was so grossly inadequate as to show a want of good faith. So long as the mortgagee acts in good faith, his right to make his money out of the mortgaged premises is not to be destroyed, or even impaired, for the sake of the protection of subsequent purchasers from the mortgagor. In this case we find no evidence of a want of good faith on the part of the mortgagees. If the plaintiffs in error have suffered in this regard, it is the result of their own negligence. They knew when they bought that they had a right to have their property released from this mortgage, by causing the mortgagees to be paid $100 per lot. They had reason to believe that the mortgagees (in view of the interest every such purchaser would have in availing himself of this protection) would reasonably assume that every purchaser would promptly apply for such release, and that any purchaser who did not apply for such release had still in his own hands so much of the purchase money as would be sufficient to procure such release. If, then, these plaintiffs in error did in fact pay over the purchase money in full to the mortgagor, it is fair to assume that they relied upon the personal responsibility of Hawhe in his covenants in his deeds. At all events, under such circumstances they could not reasonably demand the services of the mortgagees in protecting them from loss, unless they gave the mortgagees reasonably full knowledge of the necessity or want of such protection.

The proofs fail to show that these plaintiffs in error have suffered any loss. Whether, under other circumstances, mere proof that a man holds a conveyance from another is sufficient proof that he has paid the purchase money therefor, it is plain that under these circumstances it is not sufficient. The case shows that with full notice that releases of the property in parcels was provided for in the mortgage, and with full knowledge of the fact that each purchaser had the right, both as against Hawhe and the mortgagees,

to pay a certain part of the purchase money to the mort-gagees, and then to have his property released, these plaintiffs in error applied for no releases, and gave no notice that they needed protection.· The fair inference (notwith-standing the deeds) arising from these facts is, that they have never paid Hawhe for the land, and they now may protect themselves from loss by claiming, as a credit, the amount necessary to save their lots from sale, as so much paid to the administrator of Hawhe's estate upon the pur-chase money. In fact, the proof shows affirmatively that Charles Clarke, whose purchase from Hawhe was subse-quent to the record of the trust deeds and before many of the releases (his deed was made December 18, 1871), actually paid to Hawhe's administrator the full purchase money of his lots, after this bill was filed and before decree. Such defendants who fail to protect themselves when they have the power can not complain if others are not more diligent in looking after their interests than they. In the absence of proof to the contrary, the fair inference from all the circumstances disclosed in this record is that every one of the plaintiffs in error, who complain of these releases, had, at the time of the decree, enough of the purchase money for their lots still in their hands to have paid their quota. of the mortgage debt to. the mortgagees, and have de-manded a release of their lots. The decree is affirmed.

*Decree affirmed.*